FILED

FEB 0 3 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL WILDLIFE FEDERATION, ENVIRONMENTAL COUNCIL OF SACRAMENTO, FRIENDS OF THE SWAINSON'S HAWK, PLANNING AND CONSERVATION LEAGUE, and SIERRA CLUB, <br><br> Plaintiffs, <br><br> v. <br><br> GALE A. NORTON, Secretary of the Interior, and STEVEN A. WILLIAMS, Director, United States Fish and Wildlife Service, <br><br> Defendants. | CIV-S-03-0278 DFL/JFM <br><br> MEMORANDUM OF OPINION AND ORDER |

Plaintiffs are various environmental organizations who

challenge the Secretary of the Interior's issuance of an

incidental take permit under the Endangered Species Act ("Act")

for the proposed Metro Air Park ("Metro") development.   The

development is located adjacent to the Sacramento International

Airport in an area of Sacramento known as North Natomas.[1]  Based on Metro Air Park's proposed Habitat Conservation Plan ("Plan"), the Secretary, through the Fish and Wildlife Service ("Service"), issued an incidental take permit to the Metro Air Park Property Owners Association ("Association").  Plaintiffs challenge the Plan and the permit principally on the grounds that (1) the Association has not ensured adequate funding for the mitigation measures and (2) the required mitigation is not the maximum practicable.  The parties have filed cross-motions for summary judgment.

<u>I.   Facts and Procedural History</u>

<u>A.   The Metro Air Park Project</u>

The Metro project site is located next to the Sacramento International Airport, between Elkhorn Boulevard and Elverta Road.  (AR 6007.)  The site is located within the Natomas Basin in Sacramento County.  (AR 6004.)  The project contemplates development of all 1,892 acres of the site, as well as about 100 acres of adjoining land needed for infrastructure.  (AR 6007)  The development would include commercial, light industrial, and office space, hotels, a golf course, and necessary roads and infrastructure.  (AR 6007.)  The site is now composed almost

---

[1]   The court previously set aside a permit issued to the City of Sacramento based upon a Habitat Conservation Plan for the entire Natomas Basin.  <u>National Wildlife Federation v. Babbitt</u>, 128 F.Supp.2d 1274 (E.D.Cal. 2000).  The Natomas Conservation Plan is not the subject of this action, although it is part of the background of events leading to the development of the Metro Air Park Plan.

entirely of agricultural lands, mostly rice fields.  However, the
land has lain fallow for several years.  (AR 6013-14.)  When in
active rice cultivation, the land provides valuable habitat for
the Giant Garter Snake; in its current fallow state, however, the
habitat value of the land is minimal to both the snake and the
Swainson's Hawk, the two species of greatest concern.  (AR 7139.)

B.  The Affected Species

The permit covers 14 species, but the parties focus
exclusively on two: the Giant Garter Snake and the Swainson's
Hawk.[2]  The Giant Garter Snake is a threatened species under both
federal and state Endangered Species Acts.  50 C.F.R. § 17.11; 14
C.C.R. § 670.5(b)(4)(E).  The snake lives near slow moving water,
and the canals and irrigation ditches associated with rice
farming can provide suitable habitat.  (AR 7066.)  Because the
snake may range over distances of up to five miles in a few days,
connectivity of the wetland habitat is important to the snake's
survival.  (AR 6020, 7067.)

The Swainson's Hawk is listed as threatened under the
California Endangered Species Act.  14 C.C.R. § 670.5(b)(5)(A).
The hawk nests in the Natomas Basin in the summer time and

---

[2]  Of the species covered by the permit, two are currently
listed under the Act: the Giant Garter Snake and the valley
elderberry longhorn beetle.  Two were formerly listed: the
Aleutian Canada goose and the peregrine falcon.  Ten are
federally unlisted: the Swainson's Hawk, the white-faced ibis,
the bank swallow, the greater sandhill crane, the tricolored
blackbird, the northwestern pond turtle, the loggerhead shrike,
the burrowing owl, the Delta tule pea, and the Sanford's
arrowhead.  The Swainson's Hawk is listed under the California
Endangered Species Act.

migrates south for the winter.  (AR 7071-72.)  The hawk feeds
primarily on rodents and so requires open fields and grasslands,
with large nesting trees providing panoramic views.  (Id.)
Fields that lack adequate prey populations or that make for poor
hunting because of vegetation height or density are not suitable
habitat.  (Id.)

C.  The Habitat Conservation Plan

The Metro Plan adopts a number of mitigation measures to
minimize the impact of development on covered species.  The most
important of these is the Plan's provision for habitat
acquisition to mitigate habitat lost to development.[3]  The Plan
requires that for every acre of land developed, half an acre of
habitat be permanently protected and managed to maximize its
conservation value.  (AR 6000.)  Thus, the Plan adopts a 0.5:1
ratio, with the ratio based not on habitat lost but on total land
developed regardless of its value as habitat.  (Id.)  Because the
Plan contemplates development of the entire site, conservation
land will be purchased off-site.

The Plan closely regulates the purchase and management of
mitigation lands.  Seventy-five percent of the mitigation lands
must be maintained as rice fields or managed marsh.  (AR 6052.)
This would primarily benefit the snake.  The remaining 25% would

_____

[3]  Other mitigation measures include several intended to
reduce harm to the snake during construction and the requirement
of best management practices for rice farming, should that
activity be resumed at the site prior to development.  (AR 6052-
6063.)

be preserved as upland habitat, primarily benefitting the hawk. (AR 6053.)   The Plan further requires that mitigation lands consist of two habitat blocks of at least 400 acres with an interlinking water supply.   (AR 7128.)   All mitigation lands must be acquired within the Natomas Basin, with a requirement that 25% be in Sacramento County.   (AR 6570-71.)   There is no requirement that any of the lands be adjacent to or near the Metro Air Park site.   In addition to the mitigation lands purchased under the 0.5:1 ratio, the Plan requires the establishment of a Swainson's Hawk preserve consisting of 200 contiguous acres to compensate for the loss of a nest tree within the Metro site.[4]   (AR 6053.)

At full development, the Plan requires the purchase and maintenance of 1208 acres of mitigation land.   (AR 6001.)   The purchase and management of this land is delegated to the Natomas Basin Conservancy ("Conservancy").   (AR 6041.)   The Conservancy is a non-profit corporation, already in existence, whose purpose is the purchase and maintenance of habitat land in the Natomas Basin.   (AR 7032.)   The Plan incorporates the Conservancy's acquisition criteria.[5]   (AR 6035.)   These criteria require that all land purchased as mitigation land be suitable as habitat for

---

[4]   The Plan requires that this land, along with the other upland habitat purchased, must be planted with the native trees preferred by nesting hawks.   (AR 6054.)

[5]   Plaintiffs maintain that the Natomas Basin Plan is not properly part of the record in this case.   (Pls.' Reply at 18-19.)   However, the relevant portions of the Natomas Basin Plan are attached to the Metro Plan as Appendix A.   (AR 6091-6107.) The court did not find it necessary to refer to any part of the Natomas Plan not actually incorporated into the Metro Plan.

the covered species.  For example, lands acquired as wetlands mitigation must contain the appropriate soils to support marsh or rice farming, have adequate setbacks, be hydrologically connected to other parcels, and have an adequate water supply.  (AR 6093.) There are corollary criteria for upland mitigation purchases. (AR 6105.)  There are also detailed management programs to maintain wetlands for the benefit of the snake and other wetland species and to maintain uplands for the hawk and other upland species.  (AR 6092-6107.)

The mitigation measures in the Plan are funded through mitigation fees paid by each developer when the developer obtains a grading permit.  (AR 6000-01.)  These fees are currently set at $10,027 per acre.[6]  (Defs.' Mot. at 14.)  There are a number of measures intended to ensure adequate funding for the mitigation requirements.  The fees are subject to automatic annual adjustments, tied to the rate of inflation.  (AR 6049.)  The Conservancy also possesses the authority and responsibility to raise the fees to adjust for any increased costs of achieving the required mitigation ratio or maintaining the habitat value of the conservation lands.  (AR 6045.)

Additionally, each developer must become a member of the Metro Air Park Property Owners Association and subscribe to its

---

[6]   The Plan originally set the per-acre fee at $5,993.  (AR 6043.)  The fee was increased by the Conservancy in 2003 to its present level.  (Defs.' Mot. at 26 n. 21.)  Of the original fee, $3,000 was allocated for land acquisition, with the remainder going to various administrative and maintenance costs.  (AR 6043.)

Covenants Conditions & Restrictions ("CC&Rs").  (AR 6007.)  The Association is the permittee and is required to implement all of the provisions of the Plan, upon which the permit is conditioned. The permit also requires the Association to adhere the Metro Air Park Implementation Agreement ("Agreement").  (AR 6592.)  The Agreement further obligates the Association to carry out the provisions of the Plan.  (AR 6559-60.)  The CC&Rs give the Association the authority to raise fees as necessary.  (AR 17199.)  The Association has the authority to place a lien on any parcel whose owner refuses to pay additional fees assessed by the Association.  (AR 6050.)

Finally, the Plan requires a program review after development of the site has reached 800 acres, or roughly the halfway point.  (AR 6066.)  During the review, an additional 200 acres may be developed; therefore, a maximum of 1000 acres may be developed before completion of the review and re-certification of the Plan and the permit.  (Id.)  This allows for adjustments to the Plan for changed conditions such as spikes in land costs or the unavailability of adequate mitigation lands on the open market.  The Plan also requires that all of the required mitigation land must have been purchased before the issuance of grading permits for the final 10% of land within the Metro site. (AR 6575.)  This provision is intended to ensure that all mitigation lands are purchased and set aside before the site is fully developed and before the remaining fees have been set and collected.

D.   The Permit

On February 21, 2002, the Service issued a permit to the
Association for development of the Metro site.  (AR 7173.)  The
permit is conditioned upon compliance with, and implementation
of, the Plan and the Agreement.  (AR 7174.)  The permit runs for
a maximum of 50 years but lasts only as long as the Association
is in existence.  (Id.)

E.   Procedural History

The Service issued Findings and Recommendations and a Record
of Decision on February 21, 2002, concluding that the
implementation of the Plan would not jeopardize the continued
existence of the snake, the hawk, or the other covered species.
(AR 7124-71.)  The Service found that:  (1) any "take" of the
covered species would be incidental to otherwise lawful
activities, (2) the Plan minimized and mitigated the impacts of
take to the maximum extent practicable, (3) the applicant ensured
adequate funding, and (4) the authorized take would not
appreciably reduce the likelihood of the survival and recovery of
the species in the wild.  (AR 7137-7144.)  The permit was issued
the same day.  (AR 7172-78.)  The plaintiffs challenge the
issuance of the permit in their complaint filed February 13,
2003.

III.  Analysis

The plaintiffs[7] claim that the Service's issuance of the

---

[7]   The defendants have not challenged the plaintiffs'
standing in this case.  Members of the plaintiff organizations

permit is arbitrary and capricious.   They argue that:   (1) there is inadequate evidence to find that the authorized take will not jeopardize the survival and recovery of the species; (2) the Plan does not ensure sufficient funding; and (3) there is no demonstration that the Plan mitigates to the "maximum extent practicable."   As will become apparent, the case largely turns on the uncontested fact that the Metro site now provides only poor habitat for both the snake and the hawk.

A.  Statutory Framework

The Endangered Species Act requires the Secretary to determine whether a given species qualifies for protection as endangered or threatened, and confers significant protection on species that are so listed.   Section 9 of the Act makes it unlawful for any person subject to the jurisdiction of the United States to "take" any member of any endangered or threatened species.   See 16 U.S.C. § 1538(a)(1).   The Act defines "take" as "to harass, harm, pursue, hunt, wound, kill, trap, capture, or collect."   16 U.S.C. § 1532(19).   "Harm" is further defined by regulation to include killing or injuring a protected species through "significant habitat modification or degradation" that impairs "essential behavioral patterns, including breeding, feeding, or sheltering."   50 C.F.R. § 17.3.

---

have presented affidavits substantially similar to those presented to the court in Babbitt, 128 F.Supp.2d at 1289-90. Those affidavits show that the plaintiffs meet the requirements of associational standing.  Plaintiffs also meet the constitutional case or controversy requirement.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130 (1992)

Section 9's broad prohibition on taking is limited by several exceptions identified in § 10. Most importantly for present purposes, § 10 allows the Secretary to issue an incidental take permit, which authorizes its holder to take some members of protected species when the taking is incidental to carrying out an otherwise lawful activity.  See 16 U.S.C. § 1539(a).  The permittee is not liable for any taking that falls within the scope of the permit.

To obtain a permit, an applicant must develop and submit a habitat conservation plan, which specifies (1) the likely impact to the species from the proposed takings; (2) the steps the applicant will take to minimize and mitigate such impacts and the funding available for such mitigation; (3) alternative actions considered, and the reasons for not selecting them; and (4) such other measures as the Secretary may require as necessary or appropriate for the purposes of the plan. See 16 U.S.C. § 1539(a)(2)(A).  Upon submission of a permit application and related conservation plan, "the Secretary shall issue the permit," if she finds, after opportunity for public comment, that (i) the taking will be incidental; (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (iii) the applicant will ensure that adequate funding for the plan will be provided; (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and (v) other measures required by the Secretary will be met.  16 U.S.C. § 1539(a)(2)(B).  The permit

10

"shall contain such terms and conditions as the Secretary deems necessary or appropriate to carry out the purposes of this paragraph."  Id.  If the Secretary finds that a permittee is not complying with the terms and conditions of the permit, she must revoke the permit.  16 U.S.C. § 1539(a)(2)(C).

> B.  Will the Authorized Take Jeopardize the Survival and Recovery of the Species?

The plaintiffs argue that the Service's decision to issue the permit was arbitrary and capricious because the Service failed to demonstrate that the take authorized by the permit will not jeopardize the covered species.  (Pls.' Mot. at 26-31.) Plaintiffs contend that the Service did not have the necessary information to make a no jeopardy finding because the mitigation land to be purchased under the Plan has not been identified. Plaintiffs also make a number of arguments based on the effects of the Plan on individual snakes living at the site.

> 1.  Failure to Identify Mitigation Lands

The Act requires the Service to find that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild."  16 U.S.C. § 1539(a)(2)(B)(iv).  The Service did make such a finding; however, plaintiffs contend that such a finding could have no basis in fact because no mitigation lands have been identified.  (Pls.' Mot. at 27-28.)  They argue that without the identification of specific mitigation lands the value of these lands as habitat to the covered species is unknown and unknowable.

1   The Metro Plan incorporates detailed land acquisition

2   criteria.  It also requires that the acquired land be managed for

3   the benefit of the covered species and describes how that will be

4   accomplished.  The Service found that the current habitat value

5   of the Metro site is quite limited, a finding that the plaintiffs

6   do not contest.[8]  (AR 7090-96, 7136.)  Under the Plan

7   approximately 2000 acres of poor habitat will be exchanged for

8   1000 acres of conservation lands specifically managed to foster

9   habitat for both the snake and hawk.  The Service could

10  rationally conclude that the Plan's acquisition criteria and

11  management scheme ensure that mitigation land will provide

12  habitat superior to that lost at the site and that far from

13  jeopardizing the species, the Plan will enhance their prospects

14  for survival.[9]

15           2.  The Survival of Individual Snakes

16

17       [8]  This finding distinguishes this case from Babbitt, 128
    F.Supp.2d at 1298.  In Babbitt, the Natomas Basin Plan failed to
18  assess the value of the habitat on land within the development
    area.  That Plan improperly assumed that all land in the Basin
19  was of equal habitat value, although only some of the land was
    subject to the permit.
20

21       [9]  Plaintiffs also argue that Sierra Club v. Marsh, 816 F.2d
    1376, 1389 (9th Cir. 1987), requires that all mitigation lands
22  must be purchased prior to issuing a permit conditioned upon
    mitigation through habitat acquisition.  However, the holding of
23  Sierra Club is based on the particular facts of that case,
    especially the critical nature of the habitat involved, a factor
24  that is missing here.  The Ninth Circuit has held that Sierra
    Club does not generally require the purchase of mitigation lands
25  before issuance of a permit.  See Southwest Ctr. for Biological
    Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515, 523-24
26  (9th Cir. 1998).  There is no general rule requiring purchase of
    mitigation lands prior to the issuance of a permit under the Act.

Plaintiffs argue that the Plan fails to ensure the survival of individual snakes that may currently be living on the Metro site. (Pls.' Mot. at 28-30.) However, a habitat conservation plan need not demonstrate the survival of individual members of a covered species. Rather, the successful plan must ensure the continued viability of covered species, and the Service concluded that the Metro Plan does just that. The Service's conclusion is not arbitrary because certain individual snakes may be harmed by development on the site. The very purpose of the permit provisions of the Act is to allow the take of individual members of a species that the Act would otherwise prohibit.

C.  Does the Plan Adequately Ensure Funding?

To obtain a permit, an applicant must "ensure that adequate funding for the plan will be provided." 16 U.S.C. § 1539(a)(2)(B)(iii). Plaintiffs argue that the Association has not ensured adequate funding of the Metro Plan. (Pls.' Mot. at 23-26.) There are a number of provisions of the Plan intended to ensure the adequacy of its funding. Most important are the provisions of the CC&Rs that give the Association the authority to impose any necessary supplemental fees on already-developed parcels – such that the first developers may yet be liable for an additional assessment if future land costs soar – and the provisions of the Agreement that require the Association to impose supplemental fees if necessary to fully implement the Plan. The mid-point review and requirement that all mitigation lands be purchased before the final 10% of the Plan site is

1  developed provide some additional assurances.   However,

2  plaintiffs argue that these provisions are inadequate because the

3  property owners could simply dissolve the Association rather than

4  impose additional fees upon themselves.   (Pls.' Reply at 11-15.)

5  Plaintiffs imagine a scenario in which land costs rise steeply,

6  most of the area is developed quickly under a fee that is too low

7  to pay for conservation lands, and it is necessary to reach back

8  to earlier developers for supplemental fees.   Plaintiffs contend

9  that developers will simply dissolve the Association rather than

10  pay the additional fees.

11       In addition to being speculative, plaintiffs' argument also

12  fails to recognize that dissolution of the Association would be

13  unlawful under the terms of the permit.   As a matter of state

14  corporate law, the Association, a California corporation, has the

15  ability to dissolve.   But the CC&Rs provide that "no provision. .

16  . relating to the [Plan] and the [permit]. . . may be modified,

17  revoked or terminated without prior written consent of the

18  [Service] and the [California Department of Fish and Game]."   (AR

19  17105.)   Dissolution of the Association would require the

20  revocation of all, or at least most, of the CC&Rs, including many

21  related to the Plan.   Therefore, dissolution would require the

22  permission of both the federal and state agencies.   Dissolution

23  of the Association would also be a violation of the Agreement, in

24  which the Association obligated itself to fully carry out the

25  Plan's conservation measures.

26       Moreover, the permit allows incidental take conditioned upon

14

compliance with, and implementation of, the Plan.  Thus, the

permit gives the property owners certain rights (to take covered

species) but also imposes certain duties (to fully implement the

Plan).  These duties do not end with the payment of the initial

mitigation fee or with the acquisition of mitigation land.  For

instance, wetlands must be continually managed as either rice

fields or marsh, both of which require seasonal flooding and

draining.  (AR 6097.)  Management of the wetlands also requires

periodic removal of exotic pest plants.  (AR 6099.)  The Plan

also requires the monitoring of trees planted to provide

Swainson's Hawk habitat, with replanting if necessary.  (AR

6054.)  If the developers dissolve the Association, and this

leads to a failure to fully implement the Plan, then their

actions violate the permit.  The Act permits the government to

pursue civil and criminal penalties against "any person who

knowingly violates. . . any provision of any" incidental take

permit.[10]  16 U.S.C. § 1540(a)(1), (b)(1).  The developers would

be subject to these penalties if they dissolved the Association

in order to avoid assessments necessary to implement the Plan.

//

//

D.  Does the Plan Mitigate to the Maximum Extent

---

[10]    There is no indication in the statute that only parties
to the permit are subject to these penalties – the use of "any
person" indicates just the opposite.  Therefore, the fact that
the developers are not parties to the permit is not relevant.  So
long as they "knowingly" violate the terms of the permit they may
be liable.

Practicable?

To issue an incidental take permit, the Service must find that the habitat conservation plan minimizes and mitigates the impacts of incidental take "to the maximum extent practicable." 16 U.S.C. § 1539(a)(2)(B)(ii).  The term "maximum extent practicable" is not defined in the statute, nor in any formal agency regulations.[11]  It joins together two somewhat opposing concepts, "maximum" and "practicable,"[12] without providing the key to their reconciliation.  Plaintiffs seem to argue that, in a plan designed like this one, where the development of land on-

_____

[11]   The Service's Habitat Conservation Planning Handbook does contain a definition of "maximum extent practicable."  See Habitat Conservation Planning Handbook at 7-3,4.  The Handbook provides that the maximum extent practicable finding "typically requires consideration of two factors: adequacy of the minimization and mitigation program, and whether it is the maximum that can be practically implemented by the applicant."  Id.  That definition basically resembles the approach taken by the Service in its Findings and Recommendations in this case.  (See AR 7140.)

[12]   The parties do not explicitly consider the meaning of the term "practicable."  The implication in the plaintiffs' briefs is that "maximum extent practicable" means the most that can possibly be done – in other words, the most the developers could pay while still going forward with the project.  While the meaning of the term "practicable" in the statute is not entirely clear, the term does not simply equate to "possible."  "Practicable" is often used in the law to mean something along the lines of "reasonably capable of being accomplished."  Black's Law Dictionary (7th ed. 1999).  For example, "practicable" is defined in a Federal Highway Administration regulation as "capable of being done within reasonable natural, social, or economic constraints."  23 C.F.R. § 650.105(k).  "Practicable" is used twice in Fed.R.Civ.P. 23 and neither time is it synonymous with "possible."  Courts also universally interpret the phrase "as soon as practicable," which is common in insurance policies, to mean "within a reasonable time."  See, e.g., Ormet Primary Aluminum Corp. v. Employers Ins. of Wausau, 725 N.E.2d 646, 655 (Ohio 2000).

site is mitigated through the purchase and set-aside of land off-site, the maximum extent practicable requirement means that the plan must require the purchase of as much mitigation land as the particular developer possibly could afford while still going forward with the development.  The environmentally superior alternative for the species would always be the preservation or creation of as much habitat as possible before the project would be rejected by a developer as too expensive.  The Service, however, does not approach the maximum extent practicable requirement in this way.  Rather, the Service looks to whether the mitigation is "rationally related to the level of take under the plan."  (AR 7140.)

The statutory language is consistent with the Service's interpretation.  The statute requires that "the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of" its take.  16 U.S.C. § 1539(a)(2)(B)(ii).  The words "maximum extent practicable" signify that the applicant may do something less than fully minimize and mitigate the impacts of the take where to do more would not be practicable.  Moreover, the statutory language does not suggest that an applicant must ever do more than mitigate the effect of its take of species. Thus, if a permit authorized the destruction of one acre of habitat that normally supports one individual member of a protected species, it would not be necessary for the applicant to create 100 acres of new habitat that would support some 100 individuals of the species, even if the particular developer

could afford to do so.   The Service's construction of the

statute is entitled to deference under <u>Chevron U.S.A. Inc. v.</u>

<u>Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 104 S.Ct.

2778 (1984).[13]   Because the phrase "maximum extent practicable"

is at best ambiguous, the court will defer to the construction of

the agency, so long as it is reasonable.   <u>Id.</u> at 844.   The

Service's view of the statutory language as requiring that the

level of mitigation must be "rationally related to the level of

take under the plan" is entirely reasonable and avoids absurd

results.[14]   It also avoids unduly enmeshing the Service in

developers' economic affairs and projections.

Using this construction of the statute, the Service made a

finding that "the level of mitigation provided for in the [Plan]

more than compensates for the impacts of take that will occur

---

[13]   The court recognizes that there is uncertainty about
when agency interpretations receive <u>Chevron</u> deference.   <u>See</u>
Richard Pierce, <u>Administrative Law Treatise</u> § 3.5 (4th ed. 2004
supp.).   Formal agency rules announced after notice and comment
clearly do receive full deference, while more informal agency
determinations may not.   <u>See</u> <u>United States v. Mead Corp.</u>, 533
U.S. 218, 230, 121 S.Ct. 2164 (2001) (holding that a statutory
construction in a Customs letter received no deference).   The
court is persuaded that <u>Chevron</u> deference is appropriate in this
instance given the "interstitial nature" of this legal question,
the importance of the meaning of "maximum extent practicable" to
the administration of the permit scheme, and the "expertise" of
the Service.   <u>See</u> <u>Barnhart v. Walton</u>, 535 U.S. 212, 222, 122
S.Ct. 1265 (2002).

[14]   Under plaintiffs' interpretation, a permit that allows
disturbance of one acre of Giant Garter Snake habitat could
require the developer to create and manage one thousand acres of
replacement habitat if that was the maximum the developer could
afford.

under the plan."[15]   (AR 7140.)   Based on such a finding, the

Service was under no obligation to inquire whether additional

mitigation was financially possible.   All that was reasonably

required to mitigate had been included in the Plan.[16]

Even accepting plaintiffs' contention that the statute

requires mitigation up to the financial breaking point, there is

sufficient evidence here from which to draw that conclusion.   The

Service had evidence that the total development fees for the

Metro Air Park project are among the highest in the Sacramento

region, so the imposition of the higher fees necessary to

_____

[15]   Plaintiffs argue that other evidence shows that the
agency's conclusion that the Plan mitigated to the maximum extent
practicable is arbitrary and capricious.   They cite a number of
internal documents from Service biologists questioning the
adequacy of the mitigation ratio. (Pls.' Mot. at 17-18.)
However, the mere existence of internal disagreements between
agency experts does not make the agency's decision arbitrary or
capricious.   Aluminum Co. of Am. v. Bonneville Power Admin., 175
F.3d 1156, 1161-62 (9th Cir. 1999).   Plaintiffs also argue that
the 0.5:1 ratio in the Metro Plan is significantly lower than
that required by other plans in the region. (Pls.' Mot. at 19-
20.)   These plans, however, deal with additional species and use
very different methods for calculating the mitigation ratio.
(See, e.g., San Joaquin County Plan 4.1.2.)   Their use of higher
ratios is not determinative of what is adequate or practicable in
the Metro Plan, particularly given that the development lands
currently provide little or no habitat of value.

[16]   Plaintiffs argue that the Service had to consider an
increased mitigation alternative in order to make a finding that
further mitigation measures were not practicable.   It is true
that consideration of a higher mitigation alternative will often
be useful to the Service when determining whether additional
mitigation is practicable.   See Babbitt, 128 F.Supp.2d at 1292;
HCP Handbook at 7-3.   However, in the Metro Plan, increased
mitigation would mean the purchase of more land for habitat.
Since the Service found that the mitigation provided "more than
compensates" for the impact of take, it was not necessary to
consider alternatives that would do even more.

1  purchase more habitat would make the project uncompetitive with

2  other development in the area.   (AR 7140.)   The developers are

3  also exposed to liability for supplemental fees should those

4  prove necessary.   This evidence is adequate to support the

5  Service's conclusion that higher mitigation fees are

6  impracticable, given that the existing lands are of little value

7  and that mitigation fully compensates for any taking.

8  <center>IV.   Conclusion</center>

9       The Fish and Wildlife Service made of all the proper

10  statutory findings before issuing the incidental take permit for

11  the Metro Air Park development.   The Service's ultimate

12  conclusion that the mitigation measures included in the Metro Air

13  Park Habitat Conservation Plan would benefit the Giant Garter

14  Snake and the Swainson's Hawk, along with the other covered

15  species, is reasonable given the degraded nature and poor quality

16  of the habitat on the development site.   The Service's decision

17  to issue the permit is not arbitrary and capricious.   Therefore,

18  plaintiffs' motion for summary judgment is DENIED; defendants'

19  cross-motion for summary judgment is GRANTED.

20

21       IT IS SO ORDERED.

22  Dated:  *3 February 2004*.

23

24

25

26  DAVID F. LEVI
   United States District Judge

United States District Court
for the
Eastern District of California
February 4, 2004


* * CERTIFICATE OF SERVICE * *


2:03-cv-00278


National Wildlife

    v.

Norton

_____

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on  February 4, 2004, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.


        Laura Marie Robb                    HV/DFL
        Earthjustice Legal Defense Fund Inc
        426 17th St., 5th Floor             CF/JFM
        Oakland, CA 94612-4230

        John F Kostyack
        PRO HAC VICE
        National Wildlife Federation
        1400 16th Street NW
        Washington, DC  20036

        Keith W Rizzardi
        United States Department of Justice
        Environment & Natural Resources Division
        PO Box 7369
        Ben Franklin Station
        Washington, DC  20044-7369

        Edmund F Brennan
        United States Attorney
        501 I Street Suite 10-100
        Sacramento, CA  95814


                              Jack L. Wagner, Clerk


                              _____
                              by: Deputy Clerk